## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES C. SIMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:07-00299** |
| **v.** | ) | **Judge Wiseman/Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.

Docket Entry No. 12. Defendant has filed a Response, arguing that the decision of the

Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No.

16. Plaintiff has filed a Reply. Docket Entry No. 17.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

1

# I. INTRODUCTION

Plaintiff filed his initial applications for DIB and SSI on April 6, 2004, alleging disability since January 13, 2004, due to foot, back, and chest injuries. *See, e.g.,* Docket Entry No. 10, Attachment ("TR"), pp. 15, 57-60, 81, 85, 387-390, 414-415. Plaintiff's applications were denied initially (TR 25-27, 31-34) and upon reconsideration (28-30, 35-38).

Plaintiff subsequently requested (TR 39-40) and received (TR 48-51) a hearing. Plaintiff's hearing was conducted on June 1, 2006, by Administrative Law Judge ("ALJ") Donald E. Garrison. TR 402-426. Plaintiff and vocational expert ("VE"), Kenneth Anchor, appeared and testified. TR 405, 422-425.

On October 29, 2006, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 12-21. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the insured status requirements of the Social Security Act through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since January 13, 2004, the alleged disability onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following "severe" impairments: lumbar degenerative disc disease with residuals of L5-S1 diskectomy and residuals of an L3 compression fracture and fractures of the right ankle, left foot, and sternum (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

5.  The claimant has the residual functional capacity to perform a reduced range of light work activities. Specifically, he could lift and carry twenty pounds occasionally and ten pounds frequently. The claimant could stand or walk for two hours in an eight hour workday and should have the option to sit or stand at will. He could sit for a total of six hours in an eight-hour workday. The claimant could perform postural activities (*i.e.,* climbing, balancing, stooping, crouching, kneeling, or crawling) occasionally.

6.  The claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 28, 1971 and was 32 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

8.  The claimant has a high school education by GED (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the medical-vocational rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from January 13, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

TR 17-21.

The ALJ also found that Plaintiff's "statements concerning the intensity, persistence, and

3

limiting effects of [his] symptoms are not entirely credible." TR 20.

On October 24, 2006, Plaintiff timely filed a request for review of the hearing decision. TR 11. On February 10, 2007, the Appeals Council issued a letter declining to review the case (TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability beginning January 13, 2004, due to foot, back, and chest injuries. *See, e.g.,* Docket Entry No. 10, Attachment ("TR"), p. 85.

On October 9, 2000, Plaintiff visited St. Thomas Hospital complaining of left leg pain. TR 135. Upon examination, Plaintiff was diagnosed with a herniated lumbar disc at L5-S1. *Id.* On October 11, 2000, Plaintiff underwent a lumbar laminotomy, medial foraminotomy, and facetectomy for diskectomy at St. Thomas hospital for treatment of that herniated lumbar disc at L5-S1. TR 136. Plaintiff recovered from the surgery and returned to work. TR 413. On January 16, 2001, a functional capacity evaluation performed at Healthsouth indicated that Plaintiff could lift in the medium category of work. TR 348-352. Plaintiff resumed full-time construction work until January 2004. TR 18, 413.

On January 13, 2004, Plaintiff was hospitalized at Vanderbilt University Medical Center

4

after falling approximately twenty feet.[1] TR 151, 262, 263. Plaintiff suffered a chest contusion, "slightly" comminuted wedge compression fracture of L3 without spinal canal compromise, closed right talus fracture, cuboid crush injury to the left ankle, and dislocated fourth and fifth metatarsal joints in the left foot. *Id.*, TR 267, 269, 271, 415. Plaintiff underwent surgery to repair the ankle fractures, and was discharged on January 15, 2004 in a spinal brace, without having weight bearing capacity in his lower extremities. TR 151-152, 185-186, 330-333.

On February 19, 2004, orthopedic surgeon William Obremskey reported that Plaintiff's braces and casts had been removed and that the ranges of motion of his ankle joints were "minimal." TR 328. Plaintiff received x-rays, which showed that the fractures were in alignment and position. TR 218, 328. Dr. Obremskey instructed Plaintiff to continue active and passive range of motion with physical therapy, and prescribed a walking boot cast for his left foot and a splint for his right ankle. TR 328.

On April 8, 2004, Dr. Obremskey reported that Plaintiff continued to have pain in his right ankle and had been doing physical therapy with "very minimal" weight bearing on the right and "a little bit more weight" on the left. TR 327. Plaintiff's physical examination revealed "slight" swelling in his right ankle and "excellent" ranges of motion in both ankles. *Id.* Plaintiff received x-rays, which demonstrated intact screws, "slight bone reabsorption in the center of the talus," and alignment of the left foot and metatarsal bones. *Id.* Dr. Obremskey recommended that Plaintiff continue physical therapy, weightbear as tolerated, and wear normal shoes. *Id.*

---

[1] Plaintiff testified that he fell approximately thirty feet. His Vanderbilt University Medical Center discharge summary, however, reports that he fell twenty feet. Whether Plaintiff fell twenty or thirty feet is immaterial to this Court, however, as Plaintiff's injuries and treatment are the pertinent facts.

On May 20, 2004, Plaintiff complained of increasing pain in his left foot and walked with a cane. TR 326. Upon examination, Plaintiff's incisions were noted to be "well-healed," he had diminished range of motion with continued slight edema in his right ankle and his left foot was tender to palpation along the lateral aspect of the fifth metatarsal. *Id.* X-rays revealed that his plates and screws were intact and that his alignment was maintained. *Id.*

On June 21, 2004, Plaintiff underwent a CT scan of his left foot, which revealed "minimal" residual deformity of the cuboid fracture, "marked" osteopenia due to not bearing weight on the foot, and degenerative changes at the third metatarsal joint. TR 300. The remaining joint spaces were maintained, the ankle was intact and congruent, and the overlying soft tissue structures were normal. *Id.*

On June 25, 2004, Dr. Obremskey evaluated Plaintiff's complaints of deformity and pain in his left foot. TR 313. The results of Plaintiff's physical examination were normal, except for tenderness in his left foot. *Id.* Dr. Obremskey injected pain medication into Plaintiff's foot which "significantly" relieved his pain symptoms. *Id.*

On July 23, 2004, Plaintiff visited Dr. Obremskey complaining of minimal pain in his right foot, but persistent discomfort on his left TMT dislocation sited and inversion of his left forefoot. TR 314. Dr. Obremskey noted intact sensation in both Plaintiff's feet, and Plaintiff's ranges of motion of the ankles and feet were normal, except for a twenty-five percent reduction in the motion of the right subtalar joint. *Id.* Dr. Obremskey reported that Plaintiff's right ankle fracture was healed and that there was neuroma pain in his left foot at the site of the dislocation. *Id.* He noted that Plaintiff's prior injection plantarly between his fourth and fifth toes had minimal long-term effect. *Id.* Dr. Obremskey noted that Plaintiff might require a medial

opening wedge osteotomy to improve his forefoot motion, and he advised Plaintiff to bear weight on his left foot as tolerated and to be as active as tolerated. *Id.*

On November 1, 2004, DDS consultant George Bounds reviewed Plaintiff's medical records and completed a Residual Functional Capacity Assessment ("RFC") regarding Plaintiff. TR 316-321. Dr. Bounds found that Plaintiff retained the physical capacity to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull (including operating foot or hand controls) without restriction. TR 317. Dr. Bounds also found that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl. TR 318. Dr. Bounds did not find that Plaintiff had any manipulative, visual, communicative, or environmental limitations. TR 319-320. Dr. Bounds noted that he expected Plaintiff's pain to improve to permit the RFC expressed in his assessment. TR 320.

On January 20, 2005, Dr. Obremskey diagnosed Plaintiff's right ankle fracture as "healed" and his left metatarsal joint as "stable." TR 323. Plaintiff's range of motion of his right knee and ankle was normal, as were his toe flexion and extension, and he did not report any midfoot pain or tenderness. *Id.* X-rays revealed that Plaintiff's fractures were healed and his internal fixations were stable. *Id.* Plaintiff reported attending classes and performing activities of daily living without difficulty. *Id.* Plaintiff reported that he had only "occasional pain" in his right leg. *Id.* He opined that he had "improved significantly," and that his leg was "80% normal." *Id.*

On April 5, 2005, consulting orthopedic surgeon David Gaw evaluated Plaintiff's condition and noted that, at the time of the evaluation, he was working part-time for himself. TR

7

360.  Plaintiff reported that his left foot did "not really bother him other than for some numbness," but that his right ankle and foot were stiff and sore and had "some swelling," and his lower back was "sore and achy."  TR 361.  Plaintiff further reported difficulty climbing, squatting, walking on uneven ground, running, or jumping.  *Id.*  Upon examination, Dr. Gaw observed that Plaintiff walked with a "minimal limp," but had no "obvious distress or pain."  *Id.*  Dr. Gaw also observed that Plaintiff stood "without a list or scoliosis," and that Plaintiff had "excellent" movement.  *Id.*  Plaintiff's physical examination revealed numbness in his left foot and tenderness and reduced range of motion in his right ankle.  TR 361-362.  Dr. Gaw opined that Plaintiff had the residuals of several surgeries and sural nerve neuropathy of his left foot.  TR 362.  Using the American Medical Association's guidelines, Dr. Gaw rated Plaintiff's disability at five percent for his lower back, eleven percent for his total right lower extremity, seven percent for his total left lower extremity, and twelve percent of his whole person.  TR 363.

On April 14, 2005, Dr. Gaw completed an industrial injuries medical report for the State of Tennessee that indicated that Plaintiff could lift and/or carry a maximum of fifty pounds, lift and/or carry forty pounds frequently, sit for about six hours per day, and stand and/or walk for about six hours per day.  TR 353-357.  Dr. Gaw found that Plaintiff was unlimited in his ability push and/or pull (including operating hand or foot controls), and that he had no environmental or postural limitations.  TR 356.

On June 16, 2005, Plaintiff received outpatient treatment for low back pain that had worsened over a two day period at the Tennessee Christian Medical Group.  TR 347.

On December 19, 2005, Plaintiff's primary care physician, Pepito Salcedo, completed a

8

physical examination to qualify Plaintiff for a two-year commercial driver's license, wherein he opined that Plaintiff met the physical standards to qualify for that license. TR 341-343.

On March 27, 2006, orthopedic surgeon Joseph Trubia evaluated Plaintiff's complaints of left thigh pain. TR 377, 380. Dr. Trubia reported that, upon examination, Plaintiff had full range of motion in his left hip and no groin tenderness, but did have "acute tenderness along the left proximal lateral thigh," and he diagnosed Plaintiff with left greater trochanteric bursitis. *Id.*

On April 5, 2006, Plaintiff received an x-ray of his left hip, the result of which was normal. TR 376.

In April and May 2006, Plaintiff received injections of anti-inflammatory medication. TR 375-376. On April 26, 2006, Dr. Trubia noted that Plaintiff reported that the injections had afforded him "good relief" for several weeks, but that he was once again "very tender." TR 376.

On May 24, 2006, Dr. Trubia completed a Treating Source Statement Physical Capacities Evaluation form regarding Plaintiff that indicated that, during the course of an eight-hour workday, Plaintiff should never lift and/or carry fifty pounds or more, rarely lift and/or carry between twenty and forty-nine pounds, occasionally lift and/or carry between ten and nineteen pounds, and frequently lift and/or carry up to nine pounds. TR 383-384. Dr. Trubia also indicated that Plaintiff could sit for a maximum of two hours straight and a total of four hours per day, and stand or walk for a maximum of two hours straight and a total of two hours per day. TR 383. Dr. Trubia opined that Plaintiff could use both hands for simple grasping, pushing and pulling, and fine manipulation, but could operate foot controls with his left foot only. *Id.* Dr. Trubia further opined that Plaintiff could frequently reach above his shoulder, occasionally bend, squat, and crawl, and rarely climb. TR 384. Dr. Trubia noted that Plaintiff's activities were

9

additionally limited by his pain, and that if his pain was present, his ability to function would be "moderately severe[ly]" limited. *Id.*

On August 20, 2006, after lifting a door, Plaintiff received outpatient treatment for low back pain at the Tennessee Christian Medical Group. TR 338.

### B. Plaintiff's Testimony

Plaintiff testified that, at the time of the hearing, he was thirty-five years old. TR 406. He reported that he had finished the eleventh grade, but had obtained his GED. *Id.* Plaintiff acknowledged that he could read and write, as well as drive a car. *Id.* Plaintiff also acknowledged having health insurance. *Id.* Plaintiff reported that he did not have any special job training or participate in any vocational rehabilitation or job retraining programs. *Id.*

Plaintiff stated that he lived with his wife and two children, and that his wife worked outside the home. TR 406. Plaintiff testified that he had sustained a work-related injury, for which there had been a Workers' Compensation claim filed that had been settled prior to the hearing. TR 406-407. Plaintiff indicated that he no longer had Workers' Compensation medical coverage. TR 407.

Plaintiff testified that he had attempted to work since January of 2004 as a handyman who performed odd jobs and as a window installer, but that he was only able to work for a few months because it was too hard on him. TR 407-408. Plaintiff explained that the drive from his home in Portland to job sites in Nashville was difficult, resulting in stiffness that would take "awhile" for him to "get loose," and that after he had been on his feet for a couple of hours, he could not stand anymore and would have to sit down. TR 409. Plaintiff added that once he sat down, he would be unable to get back up, that his feet would throb, that his knees would hurt,

10

and that he experienced hip and back problems. *Id.* Plaintiff acknowledged that he had not attempted to perform any non-construction type work because his "love is construction." TR 408. Plaintiff reported that, at the time of the hearing, his job was as a stay-at-home father. TR 409.

Plaintiff testified that "Dr. Tribia" had taken x-rays of, and physically evaluated, his hip, and that he had been administering regular steroid shots to Plaintiff for a "couple months" prior to the hearing. TR 410. Plaintiff reported that the steroid shots had helped "ease" his pain so that it was "not as extreme." *Id.* Plaintiff stated that "Dr. Tribia" had diagnosed him with Bursitis. TR 411.

In response to the ALJ's asking Plaintiff why he could not perform a sit-down job, Plaintiff stated that he could not sit down. TR 411. He explained that he had to combine walking, sitting, standing, and lying down in order to "make it through a normal day," noting that if he did any one of those things for too long, he would hurt. *Id.*

In response to the ALJ's asking Plaintiff why he had only then-recently began going to a pain management program, Plaintiff explained that the pain in his hip had only then-recently become "unbearable." TR 411. Plaintiff further explained that he had six screws holding his right ankle together, and that he could not put pressure on his right side. *Id.* He continued explaining that his left foot had a neuroma in it that gave him "a lot of problems," but that was not as severe as his right foot. *Id.* Plaintiff noted that until approximately three months prior to the hearing, the pain in his hip had been bearable, but that it "started getting to where [he] could not put pressure on it." *Id.* He testified that he felt "like [his] hip was just going to give out and [he] was going to fall on the floor." *Id.*

11

Plaintiff testified that his pain was causing "a lot of stress and a lot of family problems." TR 411. He explained that he tried not to complain about being in pain "24/7," but that the pain had become "out of control." TR 412.

Plaintiff testified that he had had low back surgery prior to his on-the-job injury of January 13, 2004. TR 412. Plaintiff reported that his back "went out" while he "bent over to lay a block" while he was doing a side job on the weekend. TR 413. Plaintiff testified that he had a herniated disc and two bulging discs, and that he underwent the low back surgery in 1998 as a result. *Id.* Plaintiff testified that, at the time of the hearing, he continued to experience low back pain. *Id.*

Plaintiff testified that he had injured himself on January 13, 2004, when he was replacing three sets of windows that were on the third floor in an attic which was not "decked off." *Id.* The attic had insulation that covered the rafters upon which Plaintiff had to walk. TR 413. After successfully installing the first two sets of windows, Plaintiff testified that he missed a rafter, went through the drywall, hung by his elbows between the rafters, tried to swing his feet over a rafter so he could get up, but fell approximately thirty feet, landing on the marble floor in the foyer, feet first, breaking his left foot, right ankle, chest, and back. TR 414-415. Plaintiff reported that he was fired from this job two days after the accident because there was marijuana in his system at the time he was drug tested. TR 424.

Plaintiff testified that he could sit in a chair for approximately one hour before he would have to get up. TR 415. He further testified that, once he was standing, he could stand for approximately an hour to an hour and a half before he would have to sit back down. *Id.*

Plaintiff reported taking prescription Ibuprofen, as well as over-the-counter Tylenol and

Aleve for general pain, in addition to his regular steroid shots for his hip.  TR 415-416.  Plaintiff

testified that he took "a lot of hot baths," used heating pads and ice packs, and lay down to

relieve his pain so that he could "make it through a normal day."  TR 417.  Plaintiff explained

that he would lie down approximately four times per day for about forty-five minutes each time.

*Id.*  Plaintiff explained that he would stretch out and lie down in his truck when he was working.

*Id.*  Plaintiff reported that lying down took the pressure off his feet, knees, hip, and back, thereby

according him some relief.  TR 418.

Plaintiff reported that he lived with his wife and two children, aged sixteen and four.  TR

417.  Plaintiff stated that his wife took the children to school in the mornings on her way to

work.  TR 418.  Plaintiff explained his duties around the household as straightening up, putting

dishes in the dishwasher, and doing laundry.  *Id.*  Plaintiff testified that he could perform these

tasks for approximately two hours, but that he never really worked that much at one time.  TR

418-419.  He explained that he would get up to put a load of clothes in the washing machine and

put the clothes from the washing machine into the drier, but then would go sit down and take a

ten to fifteen minute break or so, and then would get up and go load the dishwasher, start it, and

go sit down again.  TR 419.

Plaintiff testified that his wife primarily did the grocery shopping because walking

around the grocery store was difficult for him.  TR 419.  Plaintiff reported that he went to church

every Wednesday and every Sunday, except when his pain was too bad for him to go.  TR 419-

420.  He explained that even when he went to church, he would need to get up and walk around

the church or stand in the back and lean against the wall.  TR 420.

Plaintiff testified that after his accident, he had enrolled in "Ball State [phonetic]" to

13

study computer information systems. TR 420. He explained that his intention was to learn a new trade so he could support his family, but at that time his wife was not making enough money to support the family so he felt that it would be best if he withdrew from the program and started working as a handyman. *Id.* Plaintiff reported that he had attended "that school" for one full semester, and had earned an A-B average. TR 421. Plaintiff reported that he had attended classes three days per week for four hours per day. *Id.* He stated that attending school had been hard on him because there was a lot of walking between buildings and the classroom chairs were hard, which would cause him pain, making it difficult to walk to the next class. *Id.*

Plaintiff testified that he did not know what his plans for the future would be, but that he would like to return to work if it were possible to get the pain under control. TR 421-422. Plaintiff added that, ideally, he would like to have a construction company where he would be the boss and his brother-in-law and other people would do the work. TR 422. He opined, however, that it would take two to three years to build a clientele, and he did not think that he would be able to "do that." TR 422.

## C. Vocational Expert Testimony

Vocational Expert ("VE") Kenneth Anchor, appeared and testified. TR 405, 422-425. The VE described Plaintiff's past relevant work as a service technician as medium, skilled work, his past relevant work as a bricklayer or mason as heavy, skilled work, and his past relevant work as a warehouse worker as medium, unskilled work. TR 405. The VE testified that Plaintiff's skills were job specific and therefore, not transferable. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, and restricting the hypothetical claimant to a range of light work with occasional postural activities.

14

TR 422.  The hypothetical claimant was further restricted to standing and/or walking a total of two hours in an eight-hour workday, and having a sit-stand option at will.  *Id*.  The ALJ asked the VE whether he was correct that a such a person would not be able to perform any of Plaintiff's past relevant work.  *Id*.  The VE responded that the ALJ was correct because Plaintiff had not performed any light work in the past.  *Id*.

The ALJ asked whether there were any unskilled light or sedentary positions available in the Tennessee regional economy that the hypothetical claimant would be able to perform.  TR 422.  The VE answered affirmatively, and testified that, as examples, in Tennessee, there were approximately 14,000 available cashier II positions, over 8,000 available general clerk positions, over 3,000 available storage clerk positions, over 2,500 cost or pricing clerk positions, and over 2,400 telephone quotation clerk positions, all of which would be appropriate for the hypothetical claimant.  TR 422-423.

The ALJ then modified the hypothetical to reflect the work restrictions indicated in Plaintiff's functional capacity evaluation (TR 348-352).  TR 423.  The ALJ asked the VE whether the jobs the VE identified as being available for the hypothetical claimant would be affected by the work restrictions indicated in Plaintiff's functional capacity evaluation.  *Id*.  The VE responded that the jobs identified as being available would remain available.  *Id*.

The ALJ again modified the hypothetical to reflect the work restrictions indicated in Dr. Gaw's evaluations (TR 353-365).  TR 423.  The ALJ asked the VE whether the jobs the VE identified as being available for the hypothetical claimant would be affected by the work restrictions contained in Dr. Gaw's evaluations.  *Id*.  The VE responded affirmatively, and noted that Dr. Gaw's evaluations would also allow for jobs at the medium level.  *Id*.

15

The ALJ then modified the hypothetical to reflect Dr. Trubia's medical assessment (TR 366-367), and queried whether Dr. Trubia's assessment would allow Plaintiff to perform full-time work. TR 424. The VE responded that he did not read Dr. Trubia's assessment to allow for a full conventional work schedule of eight hours per day. *Id.*

The ALJ asked the VE whether a finding that Plaintiff's testimony was fully credible would have any impact on the availability of the jobs identified. TR 424. The VE responded that if the difficulties described at the hearing were "at the severe or extreme level for their intensity, frequency, and duration, then the requirements of full-time work on a sustained basis in a conventional job setting may present difficulties." *Id.*

Plaintiff's counsel asked the VE what the effect of Plaintiff's testimony about his need to lie down would be, if found fully credible, on the availability of the identified positions. TR 424. The VE responded that, if Plaintiff's need to lie down was an ongoing pattern that was occurring day in and day out, week after week, it would be disruptive to work and would not be permissible. TR 425.

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

16

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been

further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

*Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v.*

*N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

      The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different

conclusion, the decision of the Administrative Law Judge must stand if substantial evidence

supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270,

273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the

Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

(*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484

F.2d 647 (6th Cir. 1973))).

      In reviewing the decisions of the Commissioner, courts look to four types of evidence:

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of

medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age,

education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

      The claimant carries the ultimate burden to establish an entitlement to benefits by

proving his or her "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which could be expected to last for a

17

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional

---

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

18

capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ, 1) failed to properly evaluate the medical opinion evidence, 2) failed to provide sufficient justification for discounting the opinion of Plaintiff's treating physician, and 3) failed to properly evaluate Plaintiff's credibility.  Docket Entry No. 13. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's

19

decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. The ALJ's evaluation of the medical evidence.**

Plaintiff contends that the ALJ erred in his evaluation of the medical evidence because he did not "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Docket Entry No. 13, p. 10, *citing* SSR 96-8p. Plaintiff argues that the ALJ picked and chose without explanation different restrictions from three relevant assessments. *Id.* Plaintiff also argues that the ALJ's decision failed to contain a thorough discussion and analysis of Plaintiff's complaints of pain and their limitations, or an explanation reconciling his determinations when those determinations conflicted with medical source determinations. Docket Entry No. 13, p. 10.

20

Plaintiff is correct that the ALJ has a duty to fully and fairly develop the administrative record, and where the evidence suggests that a claimant may well meet a listed impairment, the ALJ must develop the evidence in order to determine whether or not the listing is met. *Johnson v. Secretary*, 794 F.2d 1106, 1111 (6th Cir. 1986). In doing so, the ALJ must identify the reasons and basis for crediting or rejecting certain items of evidence (*see, e.g., Morehead Marine Services v. Washnock*, 135 F.3d 366, 375 (6th Cir. 1998); *Hurst*, 753 F.2d at 519), as there can be no meaningful judicial review without an adequate explanation of the factual and legal basis for the ALJ's decision (*Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (1991)).

As will be discussed in greater detail below, Plaintiff is incorrect in his assertion that the ALJ's decision fails to contain a thorough discussion and analysis of Plaintiff's complaints of pain and their limitations, or an explanation reconciling his determinations when those determinations conflicted with medical source determinations. The ALJ's decision specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and his subjective claims. To demonstrate, the ALJ acknowledged Plaintiff's pain and limitations, including his reported need to lie down four to five times per day for forty-five minutes per time, his reported inability to sometimes sit on the chairs at church, his reported pain, stiffness, soreness, achiness, and residual numbness, as well as his reported difficulty climbing, squatting, walking on uneven ground, running, jumping, twisting, bending, or heavy lifting. TR 19. The ALJ also discussed the medical records and assessments of Dr. Obremskey, Dr. Salcedo, Dr. Gaw, Dr. Trubia, and Dr. Bounds. TR 17-21.

After reviewing the record as a whole, the ALJ specifically found that Plaintiff had significant limitations which prevented him from performing his past relevant work and which

21

limited him to performing only those physical activities compatible with light work with postural restrictions. The ALJ accepted the opinions of the state agency medical consultants, while "according some benefit of the doubt" to Plaintiff's testimony regarding his limitations. TR 20. In so doing, the ALJ appropriately discussed the evidence, referenced the medical records and assessments of the physicians of record, and discussed the hearing testimony. The Regulations do not require more, and Plaintiff's argument fails.

## 2. The ALJ's justification for discounting the opinion of Plaintiff's treating physician.

Plaintiff contends that the ALJ failed to accord proper weight to the opinion of Dr. Trubia, his treating physician, and that the ALJ did not clearly articulate his rational for discounting that opinion. Docket Entry No. 13, pp. 11, 13. Plaintiff argues that the ALJ should have adopted Dr. Trubia's opinion because, 1) that evaluation was the most recent evaluation, 2) no other medical source considered the effect of Plaintiff's trochanteric bursitis on his overall ability to function, and 3) all three of the relevant functional assessments were consistent. *Id.,* pp. 12-13.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and

22

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

> (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

> ...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

It is undisputed that Dr. Trubia was one of Plaintiff's treating physicians, a fact that

would normally justify the ALJ according his opinion greater weight than that of other physicians. Dr. Trubia, however, had been Plaintiff's treating physician for approximately two months prior to his completion of a Medical Source Statement regarding Plaintiff, and his treatment of Plaintiff was limited to his complaints regarding his hip and thigh. As noted above, the more knowledge a treating source has about a patient's impairments, and the longer the treating source has treated the patient, the more weight is given to that medical opinion. 20 C.F.R. § 416.927(d); 20 C.F.R. § 404.1527(d). Although Plaintiff is correct in his assertion that Dr. Trubia's assessment was the most recent assessment, Plaintiff's argument that Dr. Trubia's assessment is therefore deserving of more weight is undermined by the limited scope of his treatment of Plaintiff and by the fact that he had only treated Plaintiff for approximately two months prior to completing that assessment.

Plaintiff also argues that Dr. Trubia's opinion must be accepted because he was the only physician to include the effects of Plaintiff's trochanteric bursitis in his assessment. As has been noted, however, Dr. Trubia's treatment of Plaintiff was limited to the hip and thigh, so although Dr. Trubia's assessment may have included his trochanteric bursitis, it failed to evaluate the full extent of Plaintiff's orthopedic impairments.

In his Medical Source Statement, Dr. Trubia opined that Plaintiff was unable to perform full-time work activities. TR 366-367. Although the ALJ was required to consider Dr. Trubia's opinion, he was not bound by statements of a treating physician that a claimant is disabled, because the definition of disability requires consideration of both medical and vocational factors. *See, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988). When considering Dr. Trubia's evaluation, the ALJ noted that Dr. Trubia's

opinion did not articulate any medical reasons as support for imposing the limitations contained therein, and he noted that Dr. Trubia's diagnosis of trochaneteric bursitis would not be expected to be disabling for an entire year.

Moreover, the portion of Dr. Trubia's opinion limiting Plaintiff's hip function to less than eight hours of activity per day was inconsistent with the record as a whole. The ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence. *Id.* When the opinions of treating physicians are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

Dr. Trubia's opinions that Plaintiff was restricted to sitting a maximum of four hours per day and restricted to engaging in physical activities for a maximum of six hours per day were inconsistent with his own diagnosis of bursitis in the left hip and his handwritten progress notes indicating, *inter alia*, that Plaintiff experienced several weeks of "good relief" from steroid injections. Dr. Trubia's opinions were also inconsistent with: (1) the assessments of Dr. Bounds and Dr. Gaw; (2) Dr. Salcedo's opinion that Plaintiff qualified for a two year commercial driver's license; (3) Plaintiff's release from Dr. Obremskey's orthopedic care; and (4) the objective medical evidence including a normal x-ray of Plaintiff's hip. The ALJ chose to accord greater weight to Dr. Trubia's treatment notes and the objective medical evidence than to the Medical Source Statement form he completed regarding Plaintiff, as those notes were consistent with the remainder of the record. TR 20.

25

The ALJ accepted the portions of Dr. Trubia's opinion that were consistent with his treatment notes, the opinions of Dr. Bounds and Dr. Gaw, and the objective medical evidence of record, and properly discounted the rest. This was within the ALJ's province. Accordingly, Plaintiff's argument fails.

### 3. The ALJ's evaluation of Plaintiff's credibility with respect to his pain.

Plaintiff contends that the ALJ failed to properly consider the entire record in evaluating Plaintiff's credibility with respect to his reported pain symptoms, and to properly articulate his credibility determination in accordance with social security rulings. Docket Entry No. 13, p. 17. Plaintiff argues that the ALJ's decision must be reversed because it "fails to contain specific reasons for the finding on credibility, is not supported by the case record, and is not sufficiently specific to make clear to the individual and to any subsequent reviews the weight the adjudicator gave to [the Plaintiff's] statements and the reason for that weight." *Id. at* 18, *citing Rogers v. Commission of Social Security*, 486 F.3d 234 (6th Cir. 2007).

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*,

923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. TR 20. The ALJ acknowledged, *inter alia*, Plaintiff's reported need to lie down four to five times per day for forty-five minutes per time, his reported inability to sometimes sit on the

chairs at church, his reported pain, stiffness, soreness, achiness, and residual numbness, as well as his reported difficulty climbing, squatting, walking on uneven ground, running, jumping, twisting, bending, or heavy lifting.  TR 19.  The ALJ specifically discussed Plaintiff's side-effects and effectiveness of his over-the-counter pain medication, steroid injections, use of ice and heat packs, frequent lying down, standing for fifteen to twenty minutes per hour, sleeping on a board, and back stretches.  TR 19-20.  The ALJ noted that these treatments sufficiently relieved Plaintiff's pain such that he could work part-time, attend computer classes (earning an A/B average), perform household chores, and engage in other activities of daily living.  *Id.*  The ALJ also discussed, *inter alia*: (1) Plaintiff's May 2004 x-rays which revealed intact hardware and maintained bone alignment; (2) his January 2005 report to Dr. Obremskey that he could attend school and perform activities of daily living and his x-rays revealing healed fractures with stable orthopedic hardware placement; and (3) Dr. Salcedo's December 2005 assessment that Plaintiff was fit enough to qualify for a two-year commercial drivers license, which noted no impairments or limitations other than an impaired foot.

As can be seen, the ALJ's decision specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and his subjective claims, clearly indicating that these factors were considered.  TR 19-20.  The ALJ's decision properly discusses Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain."  *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. § 404.1529(c)(2)).  It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with

Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all the objective medical evidence, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. TR 20. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for

29

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within ten (10) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge

30